J-A02040-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF: H.J.M. | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: B.A.M., MOTHER | : : : : : : | |
| | : | No. 884 WDA 2021 |

Appeal from the Decree Entered July 15, 2021
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
44 In Adoption 2021

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF: K.A.M. | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: B.A.M., MOTHER | : : : : : | |
| | : | No. 885 WDA 2021 |

Appeal from the Decree Entered July 15, 2021
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
44A In Adoption 2021

BEFORE: OLSON, J., MURRAY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                    **FILED: JANUARY 14, 2022**

---

[*] Retired Senior Judge assigned to the Superior Court.

B.A.M. (Mother) appeals from the July 15, 2021 decrees of the Court of Common Pleas of Erie County (trial court) terminating her parental rights to H.J.M. and K.A.M. (collectively, Children).[1]  We affirm.

**I.**

We glean the following facts from the certified record.  In October 2019, the Erie County Office of Children and Youth (OCY) filed dependency petitions for Children after they were removed from their parents' care pursuant to an Emergency Protective Order.  OCY had received reports that Mother was using methamphetamine but at that time she had not submitted to drug testing.  Mother also lacked stable housing, was facing imminent homelessness, and left Children with Father even though he did not have electricity or heat at his residence and was allegedly using methamphetamine.

Children have remained with their foster family since the dependency petitions were granted.  In 2021, OCY sought to change Children's dependency goals from reunification to adoption.  The trial court held goal change hearings on April 21 and May 26, 2021, before changing the goal to adoption.  OCY filed termination petitions between the two goal change hearings and in June 2021, the trial court held a termination hearing.  The parties stipulated to incorporate the testimony from the goal change proceedings into the record.

---

[1] Mother filed separate notices of appeal from each order and we consolidated her appeals *sua sponte*.  **See** Pa. R.A.P. 513.  The trial court also terminated the parental rights of Children's Father but he did not file an appeal.

In addition, OCY submitted the permanency review orders and court summaries that were generated throughout the pendency of the case, reports from service providers for Mother and Children and results from all of Mother's drug tests throughout the case.

Patty Bush (Bush), a caseworker at OCY, testified at the goal change hearing on April 21, 2021, that Mother had relapsed in March 2021 after a period of sobriety and she had relapsed previously during the pendency of the case. Mother told Bush that she had tested positive because she took a pill her brother had given her but she did not know what was in the pill. In addition to seeking treatment for substance abuse, one of Mother's goals was to obtain mental health treatment. Mother struggled with insomnia and was moody and angry when she did not get enough sleep.

Bush testified that Children were three and four years old and were receiving trauma counseling. K.A.M. was experiencing mood swings, crying and was wetting his pants even though he was potty-trained. Bush said these behaviors occurred more frequently around times Children would see Mother. Both Children told their foster mother, A.P. (A.P.) and case aide that they did not want to visit Mother. On one occasion, H.J.M. ran away from the car to avoid a visit. Mother had never been able to have unsupervised or overnight visits with Children. Bush could not estimate how long it would take to ensure that Mother could regain custody of Children. She believed that the continued reunification efforts with Mother were harmful to Children and she said that

their behaviors improved when Children were only seeing Mother through virtual visits.

Patricia Potter (Potter), executive director and outpatient therapist at Affinity Support Services, testified as an expert licensed clinical social worker with an emphasis in trauma therapy at the second goal change hearing. She had been working with H.J.M. for over a year due to his complex trauma and disruptive behavior. She explained that complex trauma arises from multiple traumatic events occurring after one another. H.J.M. had complex trauma resulting from stress and neglect while living with his biological parents and multiple changes to his caregivers. He had disclosed memories of being left with different people, not having enough food, incidents with police and seeing scary people he called "monsters" fighting and yelling with Mother and Father. Notes of Testimony, 5/26/21, at 10. He described Mother as angry and mean and said that she would hit, kick and yell when she was upset.

Potter worked to help stabilize H.J.M.'s out-of-control and self-injurious behaviors and she noticed that he would be dysregulated and upset after visits with Mother. He said he did not want to see Mother and that she was mean. He would hit himself on the head, bite or pinch himself or poke himself with objects. The visits also caused him to recall earlier traumatic experiences.

Potter said that over the course of treatment, H.J.M. had become less aggressive toward others and had fewer incidents of self-injury. He had become more skilled at voicing his feelings and needs. He was still agitated

around visits with Mother and needed help calming himself. Potter said that A.P. was involved with H.J.M.'s therapy but Mother was not. She said her role was to help H.J.M. address his trauma and she was not involved in coaching Mother on her relationship with H.J.M.

Potter opined that H.J.M. needed permanency and stability that his foster family could provide. She said that he would not be able to achieve a sense of safety, stability and trust if he continued visiting with Mother in addition to working toward adoption. She diagnosed H.J.M. with post-traumatic stress disorder (PTSD) and reactive attachment disorder and said he needed a parent who was attuned to his needs, kind, loving and nurturing.

On cross-examination, Potter said that she had not asked about Mother's progress on her goals or spoken with any of her service providers. She met with H.J.M. either weekly or biweekly in the approximately one year she had been treating him. All meetings had been over video conference due to the pandemic and A.P. was present for support due to H.J.M.'s young age. Potter believed that the foster parents were meeting H.J.M.'s needs.

Jessica Bingle (Bingle), an outpatient therapist at Affinity Family Support Services, testified regarding her treatment of K.A.M. She began treating him in July 2020 to address his reactive behavior, such as tantrums and physical aggression. He was upset around visits with Mother, said he did not want to visit her, and was uncontrollable when leaving and returning from visits. Bingle met with K.A.M. by video conference weekly at the beginning of his

treatment, eventually transitioning to every other week, and A.P. was present to keep him engaged. Bingle said that he participated in an age-appropriate manner and she did not observe any aggressive behavior during the sessions. She testified that he had learned to identify and describe his feelings. His behavior and ability to regulate fluctuated and she believed the changes were correlated with the amount of time he spent with Mother. In the month prior to the hearing, he had been wetting his pants and had decreased appetite following visits with Mother. It would often take several days for him to stop having tantrums and aggression following visits. He would also have separation anxiety if A.P. left the room or ran errands without him. Bingle diagnosed K.A.M. with adjustment disorder with anxiety. She did not involve Mother in sessions with K.A.M. She believed that he needed permanency and thought that it was in his best interest to be adopted by his foster family.

On cross-examination, Bingle confirmed that she had never observed K.A.M. interacting with Mother and was not aware of any progress Mother had made on her goals. She was concerned with how little progress Mother had made toward reunification because Mother was still struggling with substance abuse issues. She did not involve Mother in her treatment of K.A.M. because Mother had her own services for family reunification. She believed it would be counter-productive to involve Mother in the treatment aimed at addressing complex trauma caused by K.A.M.'s years in Mother's care.

A.P. testified at the goal change hearing that she and her husband were willing to adopt Children. At that time, Children had been placed in her home for approximately 19 months. She said that at the beginning of the placement, they were terrified and did not want to be near anyone in the home. She sought counseling for Children because they began showing behaviors like anger, stomping, hitting, screaming, crying, nightmares and eating issues immediately after visits with Mother. She confirmed that the behavioral issues were ongoing and occurred when Children had visits with Mother, but when visits were suspended, they were much calmer. She testified that Children refer to her and her husband as "mommy" and "daddy."

On cross-examination, A.P. said that she never asked OCY to stop visits entirely because Mother had a right to visit with Children. She had little direct contact with Mother and said she was told to block her phone number at the beginning of the case because Mother was sending her hateful messages. OCY never scheduled phone visits between Mother and Children.

Mother called Krista Stearns (Stearns), her drug and alcohol counselor at Stairways Behavioral Health, as a witness at the goal change hearing. Stearns counseled Mother from December 2019 until April 2021. Mother began in the intensive outpatient program before stepping down to outpatient treatment. Mother then felt she needed more support and requested to reenter the intensive outpatient program before she stepped back down again and was successfully discharged.

Stearns said that Mother reported her positive drug test to her in March 2021. They had planned to discharge her on April 5, 2021, but extended treatment until April 19 for additional drug tests and counseling. Stearns testified that Mother was proactive about seeking out support and always complied with treatment recommendations. She discharged Mother because she did not feel she needed any additional treatment.

On cross-examination, Stearns confirmed that Mother was successfully discharged in April 2021 despite testing positive for methamphetamine in March 2021, and that she had three relapses over the course of the case. Stearns was aware of Mother's positive test around March 14 but admitted that she did not know that Mother also tested positive on March 23 and missed two of her tests entirely that month.

Next, Mother called her blended case manager, Deborah Sardini (Sardini), who she had worked with since November 2019. Sardini acknowledged that Mother could be emotional and angry at times but said that she was loving and caring with Children, followed direction well, and was able to provide meals and play time during her visits with Children. Sardini said that Children would hug Mother and sit on her lap and testified that she did not observe any behavioral issues during those visits. Sardini had observed between 12 and 15 of the visits, which began in person but shifted to video conference during the pandemic. Mother had difficulty keeping Children engaged during the virtual visits.

The visits later moved to Mother's apartment, where she would provide a meal for Children. She had toys and bedrooms for Children. Sardini said that Mother complied with OCY's directives by gaining employment, attending therapy and completing drug and alcohol counseling. She said that the foster parents did not attend or transport Children to the visits. She did not see Children arrive at or leave the visits upset, angry or dysregulated. Sardini was eventually told by OCY that she could no longer attend visits with Mother.

On cross-examination, Sardini testified that she began meeting with Mother twice a week when the case opened and gradually reduced meetings to every other week. She said that Mother had successfully closed mental health treatment and that she was helping her obtain permanent employment. She did not observe any concerning behaviors from Mother during her visits with Children. While she was concerned about Mother's most recent relapse, she said Mother took responsibility by self-reporting her drug use. She said Mother had stopped taking medication for her nightmares because she no longer needed it but continued to take all other medication.

After the trial court changed the goal to adoption, Bush testified again at the termination of parental rights hearing. She said that Mother had been found in moderate compliance with her family services plan after each of the review hearings. One of her goals was to address her substance abuse but Mother had relapsed three times, most recently in March 2021. Mother denied her drug use on two occasions and insisted that the tests were not correct.

Mother stopped taking medication for her nightmares and Bush felt that Mother's anger issues stemmed from lack of sleep and noncompliance with the mental health treatment. She said adoption was appropriate because the Children had been in placement for 20 months and the issues persisted.

Bush described team meetings with Mother, various service providers and herself. She said that at some meetings, Mother would get angry, raise her voice and curse. Bush said Mother had been ordered to attend anger management but that she allowed her to address that in conjunction with her other therapy so as not to overwhelm her with appointments. In February 2021, Mother stopped her mental health counseling. Bush did notice behavioral and mood changes in Mother when she was attending therapy but she did not think Mother would comply with anger management because Mother did not believe she needed treatment.

Bush said that she believed termination was in Children's best interests because they needed permanency and stability. They had behavioral issues around visits with Mother and she believed those problems would escalate if they increased visitation. During dependency, Mother had two-hour supervised visits with Children but never progressed to unsupervised visits. While Mother had good and bad days, her bad days were correlated with relapses or discontinuing medication or mental health treatment. Bush did not believe termination would have any negative effect on Children.

Mother called Richele Bann (Bann), a social service aid for OCY who supervised her visitation with Children. Mother had 23 virtual visits with Children between March and May 2020, but on seven of those calls, she hung up on Bann or did not answer. Bann said Mother was often angry during these visits and Children were not engaged and would ask when the visit would end. During one visit, she told Children to have fun with their new family before hanging up. She said that Children did connect with Mother at moments and still referred to her as "mom." She opined that Mother's attitude was the primary obstacle to successful virtual visits but she could not coach Mother because she would hang up or not answer the phone. When she spoke to Sardini about the issues, she suggested that Bann call Mother before the visits to remind her to take her medication.

When Bann took over transportation for visits between February and May 2021, she observed that Children did not want to leave A.P. and needed reassurance that they would return to the foster home. Once, H.J.M. ran away from the car. Bann spoke to the case aide who supervised the visits between May 2020 and February 2021 and was told that the same issues Bann had observed in the beginning of the case had persisted.

During the supervised visits in 2021, Mother would not provide appropriate meals for Children and fed them candy and pop. She was asleep when they arrived for one visit. She would give Children age-inappropriate information, such as telling them she missed her visits because her urine test

was bad or that her court date did not go well. Bann did not see Children exhibit any separation anxiety when leaving visits with Mother.

Mother called Sardini once again at the termination hearing. She said Mother was upset during virtual visits when Children would call A.P. "mommy" and when they would leave the table without engaging with her. Mother asked if she could watch Children play during the virtual visits instead of actively engaging, but was told that if Children left the table, the visit would end. Sardini did speak with Mother about her anger and said that Mother's mental health counselor was an anger management specialist.

Mother testified on her own behalf and said that she was frustrated during the virtual visits because she does not like the phone. She said that the in-person visits went well and that she played games and took Children to the park. Children would call her "mom" and give her hugs and kisses.

Mother testified that she tested positive for amphetamines in March 2021 because her brother gave her an energy pill. She said that was the only drug she took that month and did not know why she tested positive twice. She complied with the mental health treatment goal by attending counseling and taking medication to treat her depression and PTSD. She stopped taking medication to treat her nightmares but did not speak to her doctor before doing so. Mother participated in the time-limited family reunification program but was upset that she could not see Children on holidays and birthdays. She had obtained housing and a full-time job where she worked the overnight

shift. Because her visits were at 9 A.M., she would occasionally fall asleep after work and would leave the door unlocked for Children to wake her up. The initial dependency petition also alleged that Mother allowed Children to spend time with a registered sex offender. Mother said that the offender was Father and that OCY told her that she could not keep Children from him.

On cross-examination, Mother said that OCY worked with her to find a time for visitation that did not interfere with her work schedule and that she had requested the 9 A.M. visits so she could see Children before going to sleep. She said that after she stopped taking her medication for nightmares, she began having them again. Regarding her most recent relapse, Mother testified that she tested positive for amphetamines and methamphetamines on March 14, 2021, after taking the pill from her brother. She tested negative on March 17 and missed her tests on March 19 and 21. On March 23, she tested positive for amphetamines. She admitted that the second positive test could not have been from the pill but did not know why she tested positive.

Finally, Mother called Denise DiGiacomo (DiGiacomo) of Family Services of Northwest Pennsylvania. She had provided reunification services to Mother by attending visits and meeting with her on a weekly basis. She testified that virtual visits were difficult and lasted approximately 15 minutes because Mother was frustrated and angry. When the visits became virtual for a second time in November 2020, Mother initially refused to participate, but eventually attended and was able to engage Children. She said Mother's attitude varied

and seemed to depend on her sleep schedule. She said the visits went much better when they were in person and Mother was interactive, animated and engaged with Children. She did not see Children acting fearful or anxious. She testified that Mother was sometimes angry when given feedback but would still incorporate it into her next visits.

DiGiacomo said that there had been little progress toward a reunification plan. Mother had not identified childcare plans for her work schedule. DiGiacomo testified that at times Mother was beginning to progress toward reunification, but her most recent relapse had set her back again. She said that Mother was cooperative and always came to their meetings, even if she was unhappy to be there. Mother was discharged from the program after the goal change but was never removed for noncompliance.

On cross-examination, DiGiacomo clarified that Mother had done well with in-person visits in May 2020 but had regressed and was exhibiting frustration during the February 2021 visits. Family Services had been working with Mother continuously from October 2019 until June 2021. DiGiacomo said that Mother still had more work to do before she could be reunited with Children and that her attitude fluctuated constantly during the case.

The trial court ultimately issued decrees terminating Mother's parental rights on July 15, 2021. After extensively reviewing the evidence, it held that termination was justified under 23 Pa.C.S. 2311(a)(8) because the conditions which led to their removal existed for 12 months or more after their removal,

and under 23 Pa.C.S. 2311(b),[2] that it would be in the best interest of the children if Mother's parental rights were terminated. Mother timely appealed and she and the trial court have complied with Pa. R.A.P. 1925.

## II.

On appeal, Mother argues that the trial court abused its discretion in finding clear and convincing evidence to terminate her parental rights under 23 Pa.C.S. § 2511(a) and (b).[3] We disagree.

---

[2] 23 Pa.C.S. 2511(b) provides:

> Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

[3] We review the trial court's decision for an abuse of discretion. *In re G.M.S.*, 193 A.3d 395, 399 (Pa. Super. 2018) (citation omitted). Moreover, "[w]e give great deference to trial courts that often have first-hand observations of the parties spanning multiple hearings." *In re Interest of D.F.,* 165 A.3d 960, 966 (Pa. Super. 2017). "We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re A.S.*, 11 A.3d 473, 477 (Pa. Super. 2010). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *Id.*

**A.**

Mother argues that OCY did not provide clear and convincing evidence to establish grounds for termination under subsections 2511(a)(1), (2), (5) and (8).[4]  She argues that the trial court failed to acknowledge the progress

_____

[4] Those provisions provide:

> (a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * *
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
>
> * * *

*(Footnote Continued Next Page)*

she made throughout the pendency of the case, including completing her drug and alcohol treatment, obtaining mental health treatment, establishing an appropriate home and obtaining employment. She focuses much of her argument on the disparities in the testimony between witnesses presented by OCY and her own witnesses. She contends that her witnesses directly observed her interactions with Children and disputed testimony by OCY's witnesses regarding Children's dysregulation, poor behavior and emotional outbursts surrounding visits.

"The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [the subsections of 23 Pa.C.S. § 2511(a)]." **In re Adoption of J.N.M.,** 177 A.3d 937, 942 (Pa. Super. 2018) (quoting **In re L.M**., 923 A.2d 505, 511 (Pa. Super. 2007)). Clear and convincing evidence is that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." **In re D.L.B.**, 166 A.3d 322, 326 (Pa. Super. 2017) (citation and quotation marks omitted). The court may then enter a final

---

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

decree of involuntary termination if it is in the child's best interests as outlined in Section 2511(b). *Id.*

The agency alleged that Mother's parental rights should have been terminated pursuant to subsections 2511(a)(1), (2), (5) and (8). When reviewing a trial court's order terminating parental rights, we need only agree as to one subsection of Section 2511(a), as well as Section 2511(b), to affirm the order. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Accordingly, like the trial court, we will focus on subsection 2511(a)(8)'s requirement that the conditions leading to Children's removal for 12 months or more continue to exist.

Termination under subsection 2511(a)(8) does not require consideration of the parent's willingness or ability to remedy the conditions that led to the child's placement if the conditions continue to exist. *See In re Adoption of R.J.S.*, 901 A.2d 502, 511 (Pa. Super. 2006). Even if a parent has made progress in remedying the conditions and could potentially parent the child successfully in the future, termination is justified if the conditions continue to exist after 12 months in placement and it would serve the needs and welfare of the child. *In re S.H.*, 879 A.2d 802, 806-07 (Pa. Super. 2005).

Here, it is undisputed that Children were in placement for over 12 months, as approximately 20 months elapsed between their removal from Mother's care and the termination hearing. Further, the record supports the trial court's determination that the conditions leading to Children's placement

continue to exist. While Children were in placement, Mother had supervised virtual and in-person visits but was never able to progress to unsupervised or overnight visits. She had difficulty engaging with Children during the virtual visits and would hang up the phone or make inappropriate comments. When asked why she was not engaging the Children during virtual visits, Mother said that she does not like talking on the phone.

DiGiacomo testified that Mother was more engaged with Children during the in-person visits in 2020 but struggled during the visits in 2021. She had difficulty controlling her frustration and Children's behavior during the visits and did not provide appropriate meals. DiGiacomo said that she did not see consistent improvement in Mother's parenting during the 2021 visits.[5] Mother did not have a childcare plan for Children during her overnight work shifts.

Mother was also directed to address her substance abuse and mental health issues when working toward reunification. However, she relapsed at least twice[6] during the pendency of the case, with the most recent occurring

---

[5] Sardini testified that she had observed 12 to 15 visits over the course of the dependency case and that Mother was loving and caring and had a good relationship with Children. She acknowledged that Mother was emotional and angry at times. Mother sometimes struggled to control her anger in team meetings regarding her progress at OCY. In its opinion, the trial court found Sardini's testimony to be conclusory and noted that she did not acknowledge factual inconsistencies, such as the recent relapse, missed visits with Children or anger during meetings. Opinion, 6/15/21, at 16-18.

[6] The trial court noted that OCY had identified two relapses, while Stearns, Mother's drug and alcohol counselor, testified that there had been three. Opinion, 6/15/21, at 14 n.6.

- 19 -

in March 2021. While Mother admitted to taking one pill in March 2021, she was not able to explain why she tested positive on two dates with a negative test in between. Even though Stearns testified that Mother had been successfully discharged from treatment the following month, the trial court did not credit this opinion and found that Mother was still struggling with addiction in March 2021. As the record supports this credibility determination, we may not disturb it. **A.S.**, **supra**.

Bush also testified that around the time of this relapse, Mother stopped taking medication to address her nightmares and said that she no longer needed mental health treatment. Mother admitted that the nightmares returned when she stopped taking the medication, and Bush was concerned that her frustration and anger correlated with lack of sleep. Mother missed both virtual and in-person visits because she was tired or overslept. Similarly, DiGiacomo testified that Mother seemed to have more difficulty parenting during times when she was not complying with her mental health treatment.

The record supports the trial court's conclusion that there was clear and convincing evidence that after almost 20 months, the conditions that led to Children's placement had persisted. Despite moderate efforts to achieve the goals set out for her by OCY, Mother was not able to visit with Children unsupervised and her visits had not extended past two hours. She continued to struggle with addiction and mental health issues that interfered with her ability to visit with and parent Children. While she had made progress in

obtaining employment and suitable housing, she was still not able to parent Children on a full-time basis. Her progress in some areas did not alleviate all the conditions that led to Children's placement. *See S.H.*, *supra*. Moreover, as we address *infra* in our analysis of Section 2511(b) that terminating Mother's parental rights will best serve Children's needs and welfare. Accordingly, OCY presented sufficient evidence to support termination under subsection 2511(a)(8).

**B.**

The next step of our inquiry is whether the termination is in the best interests of Children. There are several factors to consider in this analysis:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. . . . While a parent's emotional bond with his or her child is a major aspect of . . . [S]ection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015); *In re M.Z.T.M.W.*, 163 A.3d 462, 464 (Pa. Super. 2017). It is sufficient for the court to rely on the opinions of social workers and caseworkers when evaluating the impact that termination of parental rights will have on a child. *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *Id.*

Moreover, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citation omitted). The court may consider intangibles such as the love, comfort, security and stability the child might have with the foster parent. *See In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011). Ultimately, the concern is the needs and welfare of the child. *In re Z.P.*, *supra* at 1121.

Here, the record supports the trial court's determination that termination is in Children's best interests. Children were two and three years old when they were removed from Mother's care and bonded with their foster parents during their long period of placement. They refer to their foster parents as "mom" and "dad." The family has ensured that they receive trauma counseling to address dysregulation and emotional issues stemming from their years in their parents' care. Their counselors, Potter and Bingle, testified that both Children exhibited maladaptive or disruptive behaviors that would alleviate in periods when they were not visiting Mother. Over their time in therapy, the Children learned to verbalize their needs and feelings and use healthy coping mechanisms to address emotional dysregulation. The trial court did not abuse its discretion in concluding that it is in Children's best interests to remain with their foster family.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  01/14/2022